**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRANDI B.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23 C 2745** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed her application for Disability Insurance Benefits under Title II of the Social

Security Act, 42 U.S.C. §§416(I), 423, in May 2016. (Administrative Record (R.) 185-88). She

contended that she had been disabled since April 15, 2016, due to: "New Amputee, Emotional

Problems, Arthritis." (R. 205). Over the next three years, plaintiff's application was denied at every

level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals

council. She filed suit in federal district court on September 24, 2019 and filed her opening brief

seeking to overturn the denial of her application for Disability Insurance Benefits on February 2,

2020. On June 4, 2020, the Commissioner, in the District Court, filed an agreed motion to reverse

and remand the ALJ's decision. Accordingly, the case was sent back for further proceedings. (R.

1131-34).

Eight months passed, and the plaintiff had her second administrative hearing. On June 10,

2021, the ALJ again denied her application for Disability Insurance Benefits, finding that despite

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the
Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and
the first initial of their last name.

several severe impairments — obesity, left hip degenerative joint disease, below knee amputation, diabetes mellitus, asthma, fibroids, and degenerative disc disease – plaintiff nonetheless could perform sedentary work and, for up to one-third of every work day, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The ALJ found that the plaintiff needed a cane to walk and could only use her right arm to reach for up to a third of the day. The ALJ concluded that all that meant that the plaintiff could still do her past relevant work as a hospital admission clerk, medical secretary, order clerk, and item processing clerk. (R. 1068-86).

The plaintiff returned to federal court on August 18, 2021, seeking review of this second denial of her application. The parties consented to my jurisdiction on August 27, 2021, and completed briefing on April 15, 2022. On July 6, 2022, I again remanded the case back to the Commissioner, finding that, at bottom, there were "troubling gaps between the record and the ALJ's conclusions." (R. 1795).

The plaintiff had her third administrative hearing four months later, and, on December 29, 2022, a new ALJ rendered a decision which had little or nothing in common with the previous two. In fact, it was a sea change. The ALJ found the plaintiff was disabled from her alleged onset date of April 15, 2016 through July 23, 2020. Not only that, he found she was presumptively disabled from April 15, 2016 through December 31, 2017. So, that meant over four years of back benefits. But, it also meant those benefits ended as of July 23, 2020. At that point, the ALJ said the plaintiff was able to perform a significantly limited range of sedentary work, which meant she could work as a telephone solicitor or a call-out operator.

Plaintiff wanted her benefits to continue and was back in federal court to challenge that last determination on May 2, 2023. The parties consented to the jurisdiction of a magistrate judge on

May 10, 2023, and the case was assigned to Magistrate Judge Weisman. Three months later the case was reassigned to me as I had been the magistrate judge who remanded the case the second time. It is the most recent ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an Order affirming the decision.

## I.

As already noted, after a third administrative hearing, a second ALJ granted plaintiff a period of disability. That entitled her to not only Disability Insurance Benefits but also Supplemental Security Income because, at a certain point in this lengthy process, she had been out of work so long she qualified for the latter financially. The ALJ's decision was multifaceted, but we shall focus on the portion plaintiff is challenging. Through it all, the ALJ determined the plaintiff had, and continued to have, the following severe impairments: "osteomyelitis status post right below the knee amputation; left hip degenerative joint disease; right rotator cuff tendinopathy; left shoulder rotator cuff tendonitis; lumbar degenerative disc disease; and obesity." (R. 1644,1653). The combination of these impairments was serious enough to meet Listing 1.20, covering "an amputation of one or both lower extremities, occurring at or above the ankle, with complications of the residual limb(s) that have lasted, or are expected to last, for a continuous period of at least 12 months, and medical documentation of the inability to use a prosthesis(es) and a documented medical need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated mobility device involving the use of both hands" from April 15, 2016 through December 31, 2017. (R. 1646).

At that point until July 23, 2020, although the ALJ found plaintiff improved somewhat, he found she was only able to:

3

> occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. She was able to sit for two hours, stand for 15 minutes at a time, and walk for 10 minutes at a time. She was able to push and pull as much as she could lift and carry. She was not able to operate foot controls with her right foot. She was able to reach in all directions, but not reach overhead bilaterally. She was able to climb ramps and stairs to get to and from her workplace, but could not climb ladders, ropes, or scaffolds. She was able to frequently balance. She was able to occasionally stoop, kneel, and crouch, but not crawl. She was not able to work at unprotected heights, operate moving mechanical parts, or operate a commercial vehicle. She needed to use a cane to ambulate in the workplace. However, in addition to normal breaks, the claimant would be off task more than 10 percent of the workday and/or absent from work more than two days per month.

(R. 1648). The ALJ relied on the testimony of the vocational expert to find that during this period, the plaintiff was not only unable to perform her past relevant work as a unit clerk, hospital admitting clerk, order clerk, or any other jobs that existed in significant numbers in national economy. (R. 1651-53).

That brings us to July 24, 2020. The ALJ found that medical improvement occurred, and the plaintiff's disability ended. The ALJ said the plaintiff could:

> occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. She can sit for two hours, stand for 15 minutes at a time, and walk for 10 minutes at a time. She can push and pull as much as she could lift and carry. She cannot operate foot controls with her right foot. She can reach in all directions, but not reach overhead bilaterally. She can climb ramps and stairs to get to and from her workplace, but cannot climb ladders, ropes, or scaffolds. She can frequently balance. She can occasionally stoop, kneel, and crouch, but cannot crawl. She cannot work at unprotected heights, operate moving mechanical parts, or operate a commercial vehicle. She needs to use a cane to ambulate in the workplace.

(R. 1654). The medical improvement seemingly resulted in the elimination of the restrictions that plaintiff would be off task more than 10 percent of the workday and/or absent from work more than two days per month. (R. 1648, 1654). The ALJ also seemingly linked the end of plaintiff's disability to her receiving a new prosthetic on July 23, 2020. He noted that examinations indicated plaintiff

was ambulating normally without an assistive device through the end of the year. In December 2020, plaintiff complained about shoulder pain. (R. 1654).

A month later, she was diagnosed with chronic kidney disease, stage 3, but said she felt fine. Her doctor advised her to make changes to her diet and lifestyle. She began having some issues with her current prosthesis in April 2021. The ALJ noted that the plaintiff testified that she returns for new sockets/refitting due to stump atrophy about every two years. By August 2021, examination findings were normal; full spinal range of motion, normal range of motion of both shoulders and hips, and normal strength. Plaintiff reported that she was very good at walking at a slow speed, fair on uneven surfaces, good with steps, seldom got tired at the end of the day, never had hip pain, and never fell while wearing the prosthesis. She stood/walked 40 percent of the day and was walking about 400-800 yards a day. (R. 1655). The ALJ went on to relate that, in November 2021, plaintiff's kidney disease remained stage 3. Her BMI was 42.65, and she said she felt fatigued throughout the day. In March 2022, plaintiff reported that she was very happy with her prosthetic's fit and function. That continued into September 2022. The ALJ also noted that the plaintiff testified that she did not think her weight caused her any limitations. (R. 1655). The ALJ then explained that, "[b]ased on the overall evidence of record, including the testimony at the hearing, . . . the [plaintiff's] allegations regarding the severity of her symptoms not generally consistent with the evidence of record as of July 24, 2020." (R. 1656).

The ALJ then said he gave no additional weight to the state agency medical consultants' opinions as they did not have the opportunity to review the additional evidence of record since July 24, 2020. He also gave less weight to the opinions from treating physicians, Dr. Blatz and Dr. Huang, for that period, as they also did not have the opportunity to review the subsequent records, which the

ALJ felt supported a finding that medical improvement occurred and that the plaintiff became able to sustain sedentary work as of July 24, 2020. The ALJ continued to give great weight to the state agency psychological consultants' opinions as the overall evidence showed that the plaintiff's mental impairments are nonsevere and do not cause more than minimal limitations on her ability to perform work-related activities. (R. 1656). The ALJ added that the plaintiff's attorney at the hearing stated that it was possible plaintiff was entitled to a closed period of benefits and that one of plaintiff's treating providers opined that her disability ended in July 2019. (R. 1657).

Finally, the ALJ considered the testimony of the vocational expert as to the demands of the plaintiff's past relevant work and determined that beginning July 24, 2020, the plaintiff was capable of performing past relevant work as a hospital admitting clerk and an order clerk. The ALJ also relied on the vocational expert's testimony to find, in the alternative, that the plaintiff could perform other sedentary jobs that existed in significant numbers in the national economy, such as a telephone solicitor (D.O.T. #299.357-014; 71,200 jobs); telephone quotation clerk (D.O.T. #237.367-046; 2,700 jobs), and call out operator (D.O.T. #237.367-014; 1,900). (R. 1658). Accordingly, the ALJ determined that, as of July 24, 2020, the plaintiff was no longer disabled and not entitled to benefits under the Act. (R. 1659).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist*

*v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir.

2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833,

842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much

"evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.

Perales,* 402 U.S. 389, 401 (1971). *See also Baptist*, 74 F.43d at 441. To determine whether

"substantial evidence" exists, the court reviews the record as a whole, but does not attempt to

substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary

conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds

v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr

v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also

Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th

Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within

which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "an

accurate and logical bridge" between the evidence and the result to afford the claimant meaningful

judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015);

*O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the

path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th

Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained

7

that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). *See also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write Opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. In any event, the Seventh Circuit has called this requirement "lax." *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022);

8

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2]

On April 8, 2024, in *Warnell v. O'Malley*, 94 F.4th 1050 (7th Cir. 2024), the Seventh Circuit emphasized that its use of the phrase, "logical bridge," was never intended an independent doctrine or "test" to be slavishly and independently employed by courts in reviewing Social Security cases:

> Time and time again, we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements. An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize

---

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

the record, or cite support for every proposition or chain of reasoning. ...All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review.'...At times, we have put this in the shorthand terms of saying an ALJ needs to provide a 'logical bridge from the evidence to his conclusion.'

*Warnell*, 94 F.4th at 1053-54. Immediately thereafter, the Court said:

The ALJ here provided a more than sufficient explanation for why the medical record led her to deny Warnell's claim. The judge devoted considerable space to addressing the persuasiveness of Warnell's experts. She highlighted specific evidence that contradicted their conclusions, going so far as to cite and describe discrete examination findings. The ALJ also acknowledged and grappled with conflicting evidence, ultimately concluding that the treatment record as a whole supports a finding of non-disability. The law required no more of the ALJ, so we AFFIRM.

*Id.* at 54.[3]

*Warnell* constitutes a clear rejection of the unfortunate "'tendency [in the law] whereby phrases are made to do service for critical analysis by being turned into dogma.'" *Pennekamp v. Florida*, 328 U.S. 331, 352 (1946)(Frankfurter, J., concurring).

The ALJ did more than enough here.

### III.

The plaintiff has a handful of issues with the ALJ's decision which she compiles into two main arguments. First, she contends that the ALJ failed to support his finding that, on July 24, 2020, there was medical improvement related to the ability to work. Second, the plaintiff claims that the ALJ failed to support his finding that, at any time since January 1, 2018, plaintiff would be capable of performing the reduced range of sedentary work outlined in the RFC assessment. Any other

---

[3] The Seventh Circuit in *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021) emphasized that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard."

arguments the plaintiff failed to raise are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020).

### A.

First, the plaintiff argues that the ALJ arrived at a "circular conclusion – that medical improvement has occurred related to the ability to work because there has been an increase in her RFC . . . ." [Dkt. # 12, at 8]. But, reviewing the ALJ's decision, the court has to disagree, as the ALJ tied his finding of medical improvement to evidence of improvement in the record. First, the ALJ explained that the plaintiff:

> received a new prosthetic on July 23, 2020. Subsequently, she demonstrated greater abilities for standing/walking and less frequent complaints of pain. The evidence since July 24, 2020, also shows greater functional abilities with normal examination findings noted, including full spinal range of motion, normal range of motion of the bilateral shoulders and bilateral hips, and normal strength (C15F/29, 42). Overall, the evidence supports finding that the severity of the [plaintiff's] impairments have decreased in terms of signs and symptoms.

(R. 1652-53). Then, the ALJ went on to cite evidence from the medical record to support his conclusion. On August 28, 2020, plaintiff exhibited normal ambulation and was happy with the fit of her prosthetic, and her ambulation was again normal in November 2020. (R. 1654). The ALJ acknowledged that plaintiff had some issues in April 2021 (R. 1655), but in August 2021 examination findings were normal, and she was very good at walking at slow speed, fair on uneven surfaces, seldom had fatigue or pain, and never fell. At that time, she was standing or almost half of every day. (R. 1655). The ALJ acknowledged that plaintiff reported fatigue in October 2021, but in March 2022 and June 2022, plaintiff again said she was happy with the fit and function of her prosthetic. (R. 1655). The ALJ's discussion, moored securely to the record, cannot fairly be called a "circular conclusion."

The plaintiff points to a few instances in which there were less positive findings, seemingly arguing that those, and only those, must rule the day. [Dkt. #12, at 9]. But, they are few, and there is more than substantial evidence to support the ALJ's conclusion. As the plaintiff points out, she complained of shoulder pain in December 2020. Exam revealed mildly decreased range of motion in flexion and abduction and moderately decreased range of motion in extension. (R. 1604). But, contrary to the plaintiff's suggestion that the ALJ ignored such evidence, the ALJ noted it and accommodated it with a restriction on reaching overhead. (R. 1654). The next mention of plaintiff's shoulder appears to have been August 12, 2021, when right and left shoulder range of motion was normal, as was plaintiff's range of motion in her spine and both hips. (R. 1995).

The plaintiff next points to her report of issues with her prosthesis in April 2021 [Dkt. #12, at 9]. But, again, contrary to the plaintiff's contention, the ALJ did not ignore that. (R. 1655). But, it was an isolated report and, as the plaintiff herself explained at her hearing, this was routine due to changes in her stump's size. (R. 1689, 1987). Even at that time, however, she exhibited a "high K3" functional level. In April 2021, she reported having issues with her current prosthesis, but that was due to decrease in limb size. (R. 1987).[4]

Plaintiff also points to an email to her physician from August 2, 2021, in which she reported pain when walking. [Dkt. # 12, at 10] (R. 2580). But, as the ALJ said, the very next examination on August 12, 2021, examination findings were essentially normal, and she was standing and walking 40% of the day, as well as climbing 2-flights of stairs to enter her home, visiting family

---

[4] K3 on a scale of K0 to K4 denotes "the ability or potential for ambulation with variable cadence. Typical of the community ambulator who has the ability to traverse most environmental barriers and may have vocational, therapeutic, or exercise activity that demands prosthetic utilization beyond simple locomotion." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6453096/table/table1-2055668316636316/; https://www.amputee-coalition.org/resources/your-k-level/.

members and friends, attending church, moving garbage cans and sweeping the floor on regular basis. (R. 1994). Plaintiff reported that she was doing rather well in all areas with her prosthesis:

> Ease of standing up out of a chair: Very Good
>
> Ease of sitting down into a chair: Very Good
>
> My overall balance with the prosthesis: Very Good
>
> My confidence walking in unfamiliar places: Good
>
> My overall confidence using the prosthesis: Good
>
> My ability to walk at a slow speed: Very Good
>
> My ability to walk at a fast pace: Fair
>
> My ability to change speeds while walking: Good
>
> My ability on uneven surfaces (rocks, gravel, etc.): Fair
>
> My ability to walk down stairs step over step: Good
>
> My ability to walk down ramps with confidence: Good

(R. 1992). She added that she seldom got tired by the end of the day. She never fell, and she never had pain in her hips. She did sometimes avoid walking in crowds and up and down stairs. (R. 1992). Through 2021, plaintiff repeatedly reported that she was not unsteady when walking. (R. 2336, 2595, 2627). As the ALJ acknowledged, plaintiff was in need of a refitting by July of 2021. (R. 2623). Thereafter, in March 2022, June 2022, and September 2022, as the ALJ indicated, the plaintiff was ambulating well and was very happy with the fit and function of her prosthesis. (R. 1655, 1976, 1978).

An ALJ "does not need to discuss every piece of evidence in the record." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). *Accord Gedatus*, 994 F.3d at 901 (7th Cir. 2021). But the ALJ

must confront evidence that "does not support her conclusion." *Moore*, 743 F.3d at 1123. The ALJ wrote a thorough and well-reasoned Opinion here, following the medical record through the plaintiff becoming more familiar and accustomed to getting around with her prosthesis. As such, the ALJ met his obligation here. Clearly, the overall record leans convincingly to the ALJ's conclusion of medical improvement. While there were a couple of setbacks and a report of pain or fatigue here and there, the ALJ certainly did not, as the plaintiff argues, "omit[] many of these findings from his description of the record for the period at issue." [Dkt. #12, at 10]. He showed an understanding that there was contrary evidence in the record. *See Combs v. Kijakazi*, 69 F.4th 428, 435 (7th Cir. 2023)(" *see also Deborah M. v. Saul*, 994 F.3d 785, 788–89 (7th Cir. 2021) (finding no error where omitted evidence "did not reveal any substantially different information" than addressed evidence). It's simply the case that that contrary evidence was outweighed but findings that supported the ALJ's conclusions. Plaintiff may wish that the evidence were weighed differently, but that is not how substantial evidence review works. *See, e.g., Bakke*, 62 F.4th at 1068 ("This explicit weighing is precisely within the purview of the ALJ—and it is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome."), *see also Crowell*, 72 F.4th at 814 ("[Plaintiff's] arguments amount to disagreements with the administrative law judge's conclusions, and we decline her invitation to reweigh the evidence."); *Grotts*, 27 F.4th at 1279 ("[w]hen assessing an ALJ's credibility determination, we do not ... undertake a de novo review of the medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported.").

The plaintiff next takes the ALJ to task for "rely[ing] upon anecdotal evidence of capabilities in basic life activities, such as driving", arguing that the ALJ equating such activities with an ability

14

to do full-time work. [Dkt. #12, at 10]. The Seventh Circuit has repeatedly cautioned ALJs not to equate household chores and errands with the rigorous demands of the workplace. *See, e.g., Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). But, the ALJ did not do that here. He noted the plaintiff's repeated reports of being happy with her prosthetic, her increased mobility, and fewer reports of pain. (R. 1655-56). As noted, the record shows that at various times through the period, she was ambulating normally, standing or walking 40% of the time, able to walk for an hour and a half, walking a half mile a day, or on her feet fifteen hours a day. (R. 1256, 1589, 1992-94, 1976, 2006, 2007). Those capabilities arguably conflict with a claim that one cannot perform work that can be done while sitting and testimony that she can only stand for a minute or two. (R. 1702). There is a difference between saying, "the plaintiff ambulates well, so she can work" and saying, "the plaintiff ambulates well so she is exaggerating about being so limited that she is not even able to sit all day." The ALJ said the latter, not the former.[5]

Next, the plaintiff argues that the ALJ's findings of improvement in plaintiff's functioning could not rationally account for the ALJ dropping plaintiff previous off-task limitation from his RFC finding. [Dkt. #12, at 10-11]. The plaintiff harkens back to the opinions of two of plaintiff's treating physicians in 2018 that plaintiff would be off task 30% of the time and miss five days of work a month. But, it is not difficult to follow the ALJ's reasoning. Around the time of the 2018 Opinions, plaintiff was not able to function very well at all with her prosthesis. She:

> could not walk with a cane for 15 minutes or for 250 feet, or walk with a rolling

---

[5] The plaintiff says that the court addressed the same error in the previous Opinion. [Dkt. #12, at 10] Perhaps, but, the court said, as it does there had been no error in that regard. *Brandi B. v. Kijakazi*, No. 21 C 4383, 2022 WL 2463558, at *9 n. 4 (N.D. Ill. July 6, 2022)(R. 1793 n.4).

> walker for 5 minutes, or lift 10 pounds from the floor. Her prosthesis wasn't fitting properly. She continued to have pain, the treatment of which was complicated by her diabetes and renal insufficiency. Through February and into April 2017, things didn't improve. She had issues with her amputation scar and her pain made more than minimal position changes intolerable. Her limitations walking with her prosthesis at that point left her homebound. Her gait was only good enough for limited household ambulation. In June 2017 there was another assessment of plaintiff's physical progress. It was still severely difficult for plaintiff to sit for more than 5 minutes, stand for more than 3 minutes, or and lift light loads.

*Brandi B. v. Kijakazi*, No. 21 C 4383, 2022 WL 2463558, at *8 (N.D. Ill. July 6, 2022). The more recent record and plaintiff's reports of her functioning in various aspects as being good is significantly different from those older reports. So, it's less likely that plaintiff's present prosthesis problems would cause her to miss several days of work a month, or be distracted or unable to concentrate for two or three hours every day. There has been a change in the medical record, the ALJ considered it, and tied his findings to that evidence.

From there, the plaintiff argues that the ALJ ought to have contacted the two physicians who authored those 2018 opinions and ask them for a more current assessment of plaintiff's functioning. [Dkt. #12, at 12]. Given the aforementioned differences between the medical record then and the medical record more recently, those opinions are out of date. *See, e.g., Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). But, an ALJ need not recontact a medical source unless the record is inadequate to make a disability determination. *See, e.g., Simila v. Astrue*, 573 F.3d 503, 516–17 (7th Cir. 2009)("An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings . . . [a]nd . . . need not recontact the source every time []he undertakes such an evaluation, but only if, . . . the medical support is not readily discernable."). *See also Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir.2007) ("ALJs may contact treating physicians for further information when the information already in the

record is 'inadequate' to make a determination of disability...."). As already discussed, the more recent medical record here was adequate for the ALJ to make a determination. In any event, asking those doctors from 2018 about the plaintiff's condition in 2020 and 2021 would not be worthwhile unless they were still treating the plaintiff. And, according to the plaintiff, not long after those 2018 opinions were offered, she began treating elsewhere. (R. 1686).

Moreover, those 2018 opinions were checklist forms provided by plaintiff's counsel. (R. 1025-28, 1030-33). Plaintiff has been represented by counsel all along so any duty the ALJ might have had to recontact those doctors – and there was none in these circumstances – was certainly lessened as counsel could have provided the doctors with another checklist for updated opinions. *See, e.g., Bertaud v. O'Malley*, 88 F.4th 1242, 1246 (7th Cir. 2023)(". . . an attorney represented [plaintiff] before the ALJ, so the ALJ's duty to inquire was lessened. . . . We presume the attorney made [plaintiff's] best case before the ALJ."); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). But, again, that's neither here nor there, and it does not appear that it would have even been worthwhile for counsel to have done that, let alone the ALJ, as those doctors were no longer treating the plaintiff after June of 2020.

**B.**

From there, we turn to the plaintiff's contention that "the ALJ failed to support his finding that, at any time since January 1, 2018, plaintiff would be capable of performing the reduced range of sedentary work outlined in the RFC assessment." [Dkt. #12, at 12-15]. Of course, the ALJ actually found that plaintiff could perform a reduced range of sedentary work after June 23, 2020. Prior to that, the ALJ found the plaintiff was disabled. In any event, the plaintiff's criticisms of the ALJ's RFC assessment appears to essentially repeat the arguments the plaintiff raised against the ALJ's

finding of medical improvement as of June 24, 2020, and again ignore the ALJ's repeated findings regarding the significant improvement in plaintiff's functioning in August 2020, in November 2020, in August 2021, in March 2022, in June 2022, and in September 2022. (R. 1655, 1976, 1978, 1992).

First, the plaintiff claims the ALJ, like his predecessor "tended to cherry-pick benign findings from the record regarding Plaintiff's new prosthetic and widespread musculoskeletal impairments and pain to support his finding of medical improvement." [Dkt. #12, at 13]. But, that argument puts out of view the differences – as already discussed – between the medical record before the previous ALJ and the medical record from June 2020 on. It is a bit harsh to say the ALJ "cherry-picked" evidence to support his conclusion because there was a substantial "tree" full of evidence supporting his conclusions. He summarized report after report and – again as already discussed – in the main, they indicated plaintiff was happy with her prosthetic and functioning well. She did complain of pain in her shoulder at one point, but at another, she exhibited a full range of motion. Physical therapy was ordered for her shoulder, but it appears she did not follow up, (R. 1654, 1656, 1695), which indicates the shoulder pain was either not so bad or had resolved itself.

Plaintiff's attempt to turn that against the ALJ's Opinion appears based on a bit of a mix up on the plaintiff's part regarding the dates of certain reports or perhaps a misreading of the ALJ's Opinion. The plaintiff claims the ALJ ignored the fact that her physical therapy was cancelled due to the Covid-19 stay at home order. [Dkt. #12, at 13]; (R. 1327). But, the ALJ clearly mentioned that was the case. (R. 1649). And, even prior to the Covid lockdown, doctors noted that plaintiff was non-compliant with physical therapy and physician appointments. (R. 1322). The plaintiff appears to be confusing the cancelled January 2020 referral with the much later December 2020 referral. (R. 1605). As the ALJ said, the plaintiff did not follow through with *that* referral. (R. 1654-55, 1695).

18

Which, again, according to her own doctors' notes prior to that, was, unfortunately, a bit of a habit for her.

The plaintiff then criticizes the limitation the ALJ provided regarding stairs as "vague", but the ALJ said she could climb stairs to get to and from her workplace. (R. 1654). So, that would mean twice a day, if necessary, to get to and leave her workplace. That doesn't seem terribly vague. Plaintiff also finds fault with the ALJ's finding that plaintiff could reach in all directions, but not overhead, saying it "is impossible to reconcile with Plaintiff's ongoing and worsening severe shoulder abnormalities." [Dkt. #12, at 15]. But, as already noted, upon examination, plaintiff had only mildly decreased range of motion in flexion and abduction, and moderately decreased range of motion in extension in December 2020 (R. 1604), and had full range of shoulder motion in all directions in August 2021. (R. 1995). Those are not medical findings that suggest a restriction on reaching in any direction.

Next, the plaintiff characterizes the record as containing only "sporadic documentation of unremarkable examination findings." [Dkt. #12, at 13-14]. But, that is just another way of accusing the ALJ of "cherry-picking," and, as already discussed, the unremarkable findings that support the ALJ's decision were not sporadic. Time and again, plaintiff reported her prosthesis was functioning well, and she was on her feet, walking or standing, for a fair portion of each day. The plaintiff also complains that the ALJ failed to accommodate her additional limitations caused by obesity, back pain, and hip pain. [Dkt. #12, at 14]. But, the ALJ did explain the accommodation of those limitations in view of the medical evidence. (R. 1650, 1654, 1656, 1657). If there are other restrictions supported by the medical evidence, it was up to the plaintiff to specify those and support them with medical evidence, rather than simply assert things like these generalities: "people with

19

obesity may have limitations" or "fatigue may affect the person's physical and mental ability." [Dkt. #12, at 14].[6]  *See, e.g., Gedatus*, 994 F.3d at 905 (plaintiff had to point to medical evidence or opinion of "specific limitations"); *Jozefyk v. Berryhill,* 923 F.3d 492, 498 (7th Cir. 2019)("It is unclear what kinds of work restrictions might address [plaintiff's] limitations . . . because [s]he hypothesizes none."); *Brumbaugh v. Saul*, 850 F. App'x 973, 976 (7th Cir. 2021)(". . . without pointing to "medical records [that] show that she suffers from any obesity-induced limitations," plaintiff's "assertion that her obesity causes functional limitations is merely speculative."); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006)(plaintiff must "specify how h[er] obesity further impaired h[er] ability to work . . . .").  Although the plaintiff is not specific, one can imagine that being obese would put additional pressure on the limb where it fits into the prosthesis.  But, here, as already noted repeatedly, the record shows that plaintiff stands and walks for a fair portion of the day and has far fewer problems with her prosthesis, even walking or standing, than were apparent the last time this case was in federal district court.  As such,  if there was something in the medical record to show that plaintiff's obesity and her prosthesis combined to preclude her from performing a job that is done while sitting, the plaintiff should have pointed that out.

Finally, plaintiff harkens back to the previous district court Opinion for a quote here and there.  But, again, it is important to recall the ALJ's decision and 2016 through 2018 record that the district court was reviewing then, and acknowledge the stark contrast with the ALJ's decision and post-June 2020 record the court is reviewing now.  As already discussed at length, the two have little in common.  The ALJ's decision here did not cherry-pick a still-unexplained November 2019 list

_____

[6] Here, as in any other case, "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting).

20

of "Recreational Activities"[7] to buttress his decision. *Cf. Brandi B. v. Kijakazi*, No. 21 C 4383, 2022 WL 2463558, at *9 (N.D. Ill. July 6, 2022). The ALJ supported his decision by pointing to substantial evidence throughout the record from June 2020 on.

While we look back on that previous decision, it's worthwhile pointing out that the gist of it was that the plaintiff was clearly going to need a substantial amount of time to become accustomed to her prosthetic before she was ready to work again. She, in essence, had to learn how to walk. *Brandi B*., 2022 WL 2463558, at *7-8. The decision noted that the record back then "certainly suggests that, at the very least, a closed period of benefits ought to have been considered." *Brandi B*., 2022 WL 2463558, at *8. Indeed, the plaintiff's counsel took up that suggestion and ran with it at the beginning of the November 2022 administrative hearing:

> I'd also add that in, you know, kind of reading through the district court opinion – and this is something I really didn't say in our brief, but that they suggested as a possibility here – is that the claimant is not found disabled for ongoing benefits, you know, there's a possibility of considering a closed period of disability benefits here. The date of the closed period would be kind of difficult to – to glean from the notes, but, you know, I just wanted to throw out the possibility there that a closed period could be considered, perhaps ending in—once she got her walking under control from the prosthesis, which was . . . about two years after the alleged onset date.

(R. 1673). Plaintiff's counsel then returned to his closed period argument near the close of the hearing and, while not abandoning a claim for ongoing benefits, suggested that the closed period might end in mid-2018 based on the evidence. (R. 1718-19).

We have to agree with the Commissioner's attorney [Dkt. #18, at 2-3] that going from plaintiff's counsel's suggestion of a closed period ending in 2018 at the hearing to plaintiff's counsel's rather severe criticism of that ALJ's decision finding the plaintiff was entitled to a closed

---

[7] *See Brandi B.,* 2022 WL 2463558, at *9 n.3 (". . . counsel for neither side managed to come to grips with the report, . . . .").

period ending two years later in 2020 is apt to give one whiplash. But, perhaps it might be said that, if plaintiff's counsel could take two very different views of the record, it truly is a situation where reasonable minds might differ. And that, of course, would mean the ALJ's decision must be affirmed. *Tutwiler v. Kijakazi*, 87 F.4th 853, 859 (7th Cir. 2023); *Combs*, 69 F.4th at 434.

In any event, following the hearing, the ALJ took a closer look at the record and wrote a thorough and well-reasoned Opinion finding that plaintiff's disability ended, not back in June of 2018 as plaintiff's counsel posited, but not until June of 2020. As the court suggested in its previous Opinion, nothing in the record, even back then, foreclosed the possibility "that, at some point following her amputation, recovery, and rehabilitation, plaintiff did not become capable of performing sedentary work." *Brandi B.*, 2022 WL 2463558, at *10. That's the decision the ALJ arrived at here and, given the record, it's supported by substantial evidence and must be affirmed.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #17] is granted and the ALJ's decision is affirmed. The plaintiff's request to reverse or remand the ALJ's decision [Dkt. #12] is denied.

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 4/26/24